UNITED STATES of America,
Plaintiff,

v.

Pace CHESIR, et al., Defendant.

No. 08–cv–2552 (ENV)(SMG).

United States District Court,
E.D. New York.

May 29, 2012.

Bartholomew Cirenza, U.S. Department of Justice, Washington, DC, for Plaintiff.

### MEMORANDUM & ORDER

ERIC N. VITALIANO, District Judge.

The government brought this action against defendant Pace Chesir pursuant to § 7401 of the Internal Revenue Code, 26 U.S.C. § 7401, to reduce to a money judgment seven years worth of unpaid federal income tax liabilities. The government simultaneously sought to enforce a statutory lien on defendant's property. *See* 26 U.S.C. §§ 6321 & 6322. Judgment on default was entered against Chesir on August 3, 2011, after he failed to answer or move against the complaint or to seek additional time to do either. Defendant now moves under Federal Rule of Civil Procedure 60(b)(1) to vacate the default judgment. For the reasons stated below, defendant's motion is denied.

### Background

The following facts are drawn from the complaint and the parties' uncontested

(other than as to their significance) submissions on the instant motion. Offers of proof and admissions by Chesir's counsel at oral argument were also considered as if proof of the facts they referenced had been received in evidence.

In a period beginning two decades ago, defendant failed to file federal income tax returns for seven years: 1990–1994, 1996, and 1997. Then, having become aware of the filing failures, in 1997, the Internal Revenue Service ("IRS") commenced efforts to collect taxes from Chesir for those years; taxes the IRS claimed were owed based on substitute returns it had created in its attempts to discern Chesir's full tax liability.[1] Between 1997 and 2001, the IRS sent Chesir numerous letters documenting the alleged deficiencies, followed by Notices of Deficiency. Lastly, following formal assessments of the deficiencies by a delegate of the Secretary of the Treasury, demands for payment were sent. All communications were met with abject disregard.

After nearly a decade of pursuing compliance through administrative and judicial proceedings, which included obtaining a civil contempt order against Chesir from this Court, the government initiated this suit on June 26, 2008 to reduce Chesir's unpaid taxes to a money judgment and to enforce the government's statutory lien against his property.[2] Chesir was personally served in this action on July 3, 2008. The Clerk noted default against him on February 2, 2010. The Court granted the government's motion for default judgment on May 20, 2010, referring the matter to Magistrate Judge Gold for inquest and a report and recommendation ("R & R") as to the amount of the judgment.

Judge Gold held a hearing and received evidence, taking pains to ensure the government noticed Chesir regarding the proceedings. Judge Gold issued an R & R on June 27, 2011, 2011 WL 3040536, recommending judgment be entered in the amount of $713,953.26, comprised of $321,023.68 in unpaid assessed taxes and $392,929.58 in penalties and interest. He also recommended the Court grant the government's applications for an order declaring its lien and an order of foreclosure and sale. This Court adopted the R & R on July 25, 2011, 2011 WL 3104392. Final judgment entered on August 3, 2011. On December 9, 2011, the Court issued a decree of foreclosure on the government's lien and appointed a receiver to sell the foreclosed property: Chesir's home. From the date he was personally served with the complaint through the entry of judgment and decree of foreclosure almost four years later, Chesir made absolutely no contact with the Court.[3]

With apparent awareness of the government's attempt to market his home, how-

---

1. Chesir claims he made timely estimated tax payments for each year. The government does not contest their filing and the payments defendant's tax transcripts reflect (see Dkt. No. 33–3). The government, however, asserts that these payments were based on gross underestimates of Chesir's household income and were, thus, inadequate to satisfy his full tax liability.

2. A statutory lien arises automatically against "all property and rights to property, whether real or personal, belonging to" an individual upon the government's assessment of a tax against that individual and his refusal to pay despite a demand for payment. See 26 U.S.C §§ 6321 & 6322.

3. Chesir claims a letter he sent to government counsel following service of the complaint was somehow an "inartful" satisfaction of his duty to respond to the complaint. (Transcript, 5/10/12 Hearing, at 3 ("Tr.").) More importantly, Chesir makes no claim that, following receipt of his letter, the government ever misled him in its oral or written communications with him as to his unsatisfied obligation to defend this action. Despite the

ever, Chesir sprang into action, re-hiring a former counsel and, on April 17, 2012, filing the instant motion to vacate the default judgment.[4] The nub of Chesir's argument is that he suffers from a long history of persistent procrastination—he labels this a "mental illness"—which not only led to his default in this matter, but also induced his pervasive noncompliance with his IRS obligations and notices to core. In any case, Chesir also takes substantial issue with the government's assessments against him, claiming he actually made timely, estimated payments along with requests for extension to the IRS in the first instance, simply neglecting to file the actual returns. He now claims to have filed all returns properly (as of April 2012), apparently paying deficiencies as he calculated them and as he claims they existed at the close of each tax year at issue.

## Legal Standard

Rule 60(b)(1) allows a court to relieve a party from a final judgment on the basis of, among other things, "excusable neglect." Fed.R.Civ.P. 60(b)(1). Properly applied, "Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). "In other words [the rule] should be broadly construed to do substantial justice, [recognizing that] final judgments should not be lightly reopened. Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." *Nemaizer*, 793

F.2d at 61; *see also United States v. Int'l Bd. of Teamsters*, 247 F.3d 370, 391 (2d Cir.2001). "A motion for relief under Rule 60(b) is addressed to the sound discretion of the court." *Green ex rel. Estate of Green v. Advanced Cardiovascular Imaging*, No. 07 Civ. 3141, 2009 WL 3154317, at *2 (S.D.N.Y. Sept. 30, 2009).

▮ Courts have developed certain criteria to help analyze such motions. See *Brien v. Kullman Indus., Inc.*, 71 F.3d 1073, 1077 (2d Cir.1995). These criteria are 1) whether the default was willful, 2) whether defendant has a meritorious defense, and 3) the level of prejudice that may befall the nondefaulting party if relief is granted. *Gucci Am., Inc. v. Gold Ctr. Jewelry*, 158 F.3d 631, 634 (2d Cir.1998); *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir.1996). "The burden of demonstrating that a judgment should be vacated rests with the moving party." *Green*, 2009 WL 3154317, at *2. Generally, "when the adversary process has been halted because of an essentially unresponsive party, a default judgment is appropriate to protect the nonmoving party from interminable delay and continued uncertainty as to [its] rights." *United Bank of Kuwait PLC v. Enventure Energy Enhanced Oil Recovery Associates*, 755 F.Supp. 1195, 1205 (S.D.N.Y.1989).

## Discussion

### A. Defendant's Default Was Willful

▮ Though negligence may in some cases be excusable, willful default is anoth-

broad access to information and assistance made available to self-represented litigants, Chesir remained steadfast in his decision to ignore the Court.

4. This was not Chesir's first post-judgment effort to avoid the consequences of his default. Shortly after the issuance of the Court's foreclosure decree and appointment of a receiver on December 9, 2011, Chesir filed a voluntary petition for bankruptcy un-

der Chapter 13 of the Bankruptcy Code on December 27, 2011. *See* Bankr. No. 11–50687 (E.D.N.Y Bankr. Dec. 27, 2011). But, once the bankruptcy court modified the automatic stay arising under 11 U.S.C. § 362 to allow the government to continue its sale of Chesir's property, he acceded to dismissal of the petition sought by the Chapter 13 trustee. At this juncture, Chesir had still made no contact with this Court regarding his default.

er matter. Significantly, in determining whether a default was "willful," a court need not find that a defaulting defendant acted in "bad faith." *Gucci*, 158 F.3d at 635. "Thus, while a determination that the defendant acted in bad faith would certainly support a finding of 'willfulness,' it is sufficient that the defendant defaulted deliberately." *Id.* Notably, the willfulness inquiry can be decisive: once a court finds that a party willfully defaulted, "there is no need to consider whether [that party] had meritorious counterclaims and the possible prejudice [to other parties] ... if the default judgment is vacated." *Adv. Portfolio Techs., Inc. v. Adv. Portfolio Techs. Ltd.*, No. 94 Civ. 5620, 2002 WL 562650, at *7 (S.D.N.Y. April 15, 2002); *see also Bank of Montreal v. Mitsui Mfrs. Bank*, No. 85 Civ. 1519, 1992 WL 79293, at *1 (S.D.N.Y. April 7, 1992); *Bank of Kuwait*, 755 F.Supp. at 1205.

■ The record in this case compels the finding that Chesir's default was willful. His default was deliberate, and that conclusion is entirely consistent with Chesir's studied avoidance of tax compliance. This controversy arises out of unpaid taxes that go back over two decades. At oral argument, Chesir's counsel conceded that Chesir had relevant financial documents all along. (Tr. at 18–19.) He then conceded that Chesir, after massaging these documents through the prism of his experience as a certified public accountant, did not pay until last month the full amount he now computed was due—and then only after unsuccessfully filing a Chapter 13 bankruptcy petition and moving to vacate his default here. (*See* Tr. at 17–18, 21–22; Dkt. No. 28–12.) Deliberate default is manifest: after being personally served with the complaint, Chesir made no con-

tact with the Court for close to four years, ignoring notice after notice of the proceedings in the case.[5] *See Arbitron, Inc. v. Marathon Media, LLC*, No. 07 Civ. 2099, 2008 WL 892366, at *5 (S.D.N.Y. April 1, 2008) (actual notice of suit followed by failure to act on numerous judicial notices constituted deliberate default, indicating willfulness). Apparently, only the threat of losing his home—following notation of default, a grant of default judgment, an inquest on the amount of the judgment, and entry of final judgment—was enough to snap Chesir into making contact with the Court about this case.

Indeed, with willfulness so transparent, the only plausible defense is that Chesir was not in his right mind. Thus, there is, as one would expect in such situations, a late in the game visit to a mental health professional at counsel's "behest." (Tr. at 5.) But, though Chesir offers affidavits of a psychologist to support the assertion of excuse for mental incapacity, these affidavits provide only general averments that Chesir suffers from Dysthymic Disorder, a mild form of depression. Neither affidavit by the psychologist attests to Chesir's inability to proceed properly with this suit or any of his other important affairs. Moreover, Chesir's initial visit to a psychologist complaining of "a long standing problem of severe and persistent procrastination" conveniently came to pass only weeks before he filed his motion to vacate. There is no hint, much less offers of proof, that Chesir was in any way incapacitated from handling all of his *other* affairs in this period. In fact, even before this action began, it is uncontested that Chesir had sufficiently recovered from his wife's death (her illness and death were the ascribed reasons for

---

5. Chesir concedes as much in his admission that, following a brief conversation with government counsel after being served, he decided to "throw in the towel" because his conclusion was that there was nothing he could do to defend himself. (Tr. at 3, 9.)

his tax noncompliance) [6] to re-marry (long before this action was filed). Bluntly, Chesir's assertions of mental illness do nothing to establish "excusable neglect." *See Stokes v. Merson*, 38 Fed.Appx. 622, 2002 WL 1364215, *1 (1st Cir. June 20, 2002) (general allegations of mental illness insufficient to constitute "excusable neglect").[7] Certainly, the frailty of these arguments and absence of any other evidence or offers of proof that Chesir's dysthymia caused his default in this case and incapacity from other important affairs in his life in the same time period only serve to suggest Chesir's *"post hoc* rationalization[ ]" of neglect that was, in the first instance, inexcusable in its willful calculation.[8] *Greenwood Explorations, Ltd. v. Merit Gas & Oil Corp., Inc.*, 837 F.2d 423, 426–27 (10th Cir.1988) ("[T]he excuses [defendants] give for their behavior ... are merely *post hoc* rationalizations of indefensible conduct.... [L]itigants are not free to appear before the court at their pleasure."). Far from finding it excusable, the Court finds Chesir's default deliberate and willful.

### B. Defendant Presents Meager Evidence of a Meritorious Defense

Chesir's willful default, in itself, commands, as the Court holds, denial of his motion. *Adv. Portfolio*, 2002 WL 562650, at *7; *Bank of Montreal*, 1992 WL 79293, at *1; *Bank of Kuwait*, 755 F.Supp. at 1205. Though, both additional factors in the Rule 60(b)(1) equation also weigh in favor of denial. Starting with the inquiry as to the existence of a meritorious defense to the claim upon which judgment has been entered, it is clear that "[i]n order to make a sufficient showing of a meritorious defense ... the defendant need not establish his defense conclusively, but he must present evidence of facts that, if proven at trial, would constitute a complete defense." *New York v. Green*, 420 F.3d 99, 109 (2d Cir.2005) (quotations omitted); *Pecarsky v. Galaxiworld.com Ltd.*, 249 F.3d 167, 173 (2d Cir.2001). The evidence presented, importantly, must go

**6.** Chesir vigorously argues that his "mental defect" in conjunction with the death of his wife in the mid–1990s caused defendant to be unable to comply with his obligation to file tax returns. Assuming its factual validity, the argument is of no moment. The issue here is not whether some of his tax avoidance was deliberate, but whether the case default was deliberate.

**7.** Of course, situations may arise where compelling evidence of mental illness causing a default could lead to a finding of "excusable neglect." Chesir's case is simply not one of them. Seeking such salvation anyway, defendant cites *TCI Group Life Insurance Plan v. Knoebber*, 244 F.3d 691 (9th Cir.2001) for the proposition that mental illness negates a finding of willfulness in the Rule 60(b)(1) analysis. That case, however, involved circumstances far more extreme than Chesir's: "[Defaulting defendant] had been widowed less than a year before [plaintiff's] action against her, and was distraught. She was in a psychiatrist's care for her severe depression, and was taking several strong psychoactive medications." *Id.* at 699. In contrast, Chesir only recently consulted a mental health professional, and, at most, suffers from a mild form of depression which causes him to procrastinate. The only other case Chesir cites is similarly inapposite because there, defendants (proceeding under Rule 55) submitted affidavits attesting to the "incapacitating mental condition" of their attorney. See *Tri–Continental Leasing Corp. v. Zimmerman*, 485 F.Supp. 495, 497 (N.D.Cal.1980).

**8.** Defendant does not deny that he was successfully running an accounting business and timely filing tax returns for clients (Tr. at 11), nor does he contest the government's assertion that he has remained current on all state requirements for licensure as a CPA. He was also sufficiently savvy both to comply with a subpoena from the IRS just before civil contempt fines began to accrue, as well as to immediately file for bankruptcy protection following this Court's order of foreclosure.

beyond "conclusory denials." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 98 (2d Cir.1993).

■ Chesir's stated defense is simple: he does not owe any additional taxes and the government's calculations of his liability to the contrary are wrong. Chesir claims that, despite his failure to file returns, he timely paid estimated taxes and then the additional tax he paid in April 2012. At oral argument, Chesir represented that he has reviewed documentation—in the form of bank statements, brokerage documents, and other financial records—that would allow him to demonstrate the accuracy of his own calculations. But, a meritorious defense in a case like this requires more—the ability to make an evidentiary showing of why the government's calculation is *incorrect.* It is well-established that "an IRS notice of tax deficiency is presumed to be correct." *United States v. Letscher,* 83 F.Supp.2d 367, 372 (S.D.N.Y.1999); *see also Moretti v. C.I.R.,* 77 F.3d 637, 643 (2d Cir.1996) ("A notice of deficiency sent to a taxpayer pursuant to section 6212 carries a presumption of correctness requiring the taxpayer to prove by a preponderance of the evidence that the Commissioner's determination was erroneous.") (quotations omitted). And history gives great insight here. The government argues (and Chesir concedes) that much of the information underlying its calculation of defendant's deficiencies came from third-party data and information gleaned from audits of Chesir performed by the New York State Department of Taxation and Finance—audits which established Chesir had understated his income by hiding it. Aside from general averments as to the invalidity of the New York State audits, Chesir makes no offer of proof demonstrating how he would rebut data from the state audits or outside sources showing he owed taxes on income ᵥhe had not disclosed, income which would not be expected to be readily reflected in the financial records he retained.[9]

### C. The Government Will Suffer Prejudice If the Judgment is Vacated

The final factor is "whether and to what extent, vacating the default judgment will prejudice the nondefaulting party. Some delay is inevitable when a motion to vacate a default judgment is granted; thus, delay alone is not a sufficient basis for establishing prejudice." *Green,* 420 F.3d at 110 (quotations omitted). "Something more is needed. For example, delay may thwart plaintiff's recovery or remedy. It also may result in the loss of evidence, create increased difficulties of discovery, or provide greater opportunity for fraud and collusion." *Id.* However, "prejudice may be presumed as a matter of law in certain cases, but the issue turns on the degree to which the delay was lengthy and inexcusable." *United States ex rel. Drake v. Norden Sys.,* 375 F.3d 248, 256 (2d Cir.2004).

■ In this case, more than mere delay would prejudice the government if the judgment were vacated. Since defendant chose not to file an answer or otherwise advise the Court if he would defend against the complaint, there has been no pretrial management or discovery. The lack of discovery is especially salient because Chesir claims to have many documents to support his case that he had squirreled away. (*See* Tr. at 18–19.) The government's case, on the other hand, has always been that there was more income than Chesir claimed and that assertion was

---

9. Obviously, defendant makes no claim to a meritorious defense as to the portion of the judgment relating to penalties for his admit- ted failure to file timely tax returns for the relevant years.

 

confirmed by state tax audits more than a decade ago. Vacatur would force the government to scramble to recreate this ancient data set, including from a state agency with no reason to keep it.

Stated specifically, the passage of time here will create a particularly onerous burden because an apparent focus of Chesir's defense implicates audits by the New York State Department of Taxation and Finance completed in 1994 and 1995. (Tr. at 6.) Since these audits were used by the IRS to create substitute returns for defendant for use in the government's calculation of Chesir's tax liability, the audits would be a focus at trial. Even though Chesir would have the burden to disprove the validity of those audits and the resulting IRS tax calculation, the government would undoubtedly want the wherewithal to rebut the attack, which the passage of time makes far more difficult. Surely, personnel turnover, faded recollections, and document retention policies as to audit workpapers will cause havoc. See *Canini v. U.S. Dept. of Justice Federal Bureau of Prisons*, No. 04 Civ. 9049, 2008 WL 818696, at *4 (S.D.N.Y. March 26, 2008) (noting prejudice where it would be "difficult to retrieve records and to locate individuals who have knowledge of the facts or who may be able to recall information regarding the circumstances of" the case).

Dispositively, in any event, regardless of any tangible inferences that might be made with respect to prejudice to the government, "prejudice to the [government] may be presumed because ... [Chesir]'s delay was both 'lengthy and inexcusable.'" *Id.* In this light, the third factor too weighs decidedly against granting relief.

The sum of all the factors is greater than the parts. It has been four years since the filing of the complaint and over two decades since Chesir's failure to file the earliest of the missing tax returns at issue. The circumstances make clear that Chesir's default in this case was willful, and the Court so finds. To make matters worse, defendant presents scant evidence of a meritorious defense, but there is much to support the notion that vacating the default judgment would cause substantial prejudice to the government in prosecuting the action (indeed, prejudice can be presumed). Therefore, defendant has failed to demonstrate excusable neglect or any other ground supporting relief from the judgment.

### Conclusion

In accord with the Court's findings, defendant's motion pursuant to Federal Rule of Civil Procedure 60(b)(1) to vacate the default judgment entered against him on August 3, 2011 is denied. The order of enforcement directing sale of defendant's real property by the appointed receiver and distribution of the sale proceeds shall remain in full force and effect.

The Clerk of Court shall maintain this case on the closed docket.

**SO ORDERED.**